IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | Criminal No. 2:09-CR-1345-DCN |
| vs. | ) | |
| | ) | |
| DANIEL FRED ALSTON, | ) | **ORDER AND OPINION** |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on defendant's motion to suppress and dismiss.

Defendant moves to suppress quantities of marijuana, cocaine base ("crack"), and powder

cocaine found on his person following a traffic stop and Terry frisk,[1] and to dismiss the

federal drug charge stemming from this incident. Defendant claims that the frisk

amounted to an unlawful search, in violation of the Fourth Amendment. The government

filed a response in opposition on September 7, 2010, and this court held a suppression

hearing on September 21, 2010. For the reasons set forth below, the court denies

defendant's motion.

## I. BACKGROUND

On October 10, 2009, on Pratt Street, in Charleston, South Carolina, two City of

Charleston Police Department (CPD) officers conducted a traffic stop on a car driven by

Robert Varner after they observed Varner make an improper turn. Defendant was the sole

passenger in the vehicle. Subsequent to a Terry frisk during the stop, the officers

discovered a cigar box containing marijuana cigarettes and crack in defendant's

_____

[1]Terry v. Ohio, 392 U.S. 1 (1968).

1

waistband and a bag containing crack and powder cocaine in his front left pants pocket. They also seized $645 in U.S. currency from defendant's person. The officers charged defendant with trafficking crack, possession with the intent to distribute cocaine, possession with intent to distribute cocaine in close proximity to a school, and possession of marijuana, second offense. On December 8, 2009, a federal grand jury indicted defendant on one count of possession with intent to distribute five grams or more of crack and a quantity of powder cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 841(b)(1)(C).

On August 26, 2010, defendant filed the instant motion pro se, even though he is represented by Assistant Federal Public Defender Mary Gordon Baker. The government responded to defendant's motion on September 7, 2010, and AFPD Baker filed a supplemental memorandum on behalf of defendant on September 14, 2010. This court held a suppression hearing on September 21, 2010. At the hearing, the government presented the testimony of CPD Officer Levi Duyn and submitted as exhibits the cigar box containing marijuana cigarettes and crack, the drugs seized from defendant's pants pocket, and a copy of the traffic ticket issued to Varner. Defendant presented the testimony of Varner and three of defendant's family members, and submitted as exhibits maps, photographs, and the CPD incident report related to the traffic stop.

According to Officer Duyn's testimony, on October 10, 2009, he and Officer Seay were riding in the same unmarked patrol car on Pineview Road, in Charleston. Officer Duyn stated that he and Officer Seay saw the car driven by Varner approaching from the opposite direction on Pineview, approximately forty yards away. Officer Duyn said they

saw Varner make a right turn onto Pratt Street without using a turn signal. The officers activated their blue lights and siren, and the vehicle traveled approximately a quarter of a mile before pulling into the driveway at 20 Pratt Street, which was later identified as defendant's father's residence. Officer Duyn stated that there were no cars between Varner's car and the patrol car at any point during the traffic stop, and nothing obstructed the officers' view.

Officer Seay approached the driver's side of the car and began to interview Varner, and Officer Duyn approached the passenger's side of the car. Officer Duyn testified that he smelled a strong odor of marijuana coming from the car as he approached the front passenger window. Officer Duyn asked defendant why he and Varner pulled into the driveway at 20 Pratt Street, and defendant said it was his father's house. Officer Duyn stated that defendant became increasingly nervous and that he began to shift in his seat and reach into his front left pants pocket. Officer Duyn ordered defendant to keep his hands out of his pockets. Defendant continued to fidget, and with his right hand, he began playing with the front of his shirt. Defendant again tried to reach toward his front left pocket and then toward the center console. Officer Duyn once again ordered defendant to keep his hands out of his pockets and where Officer Duyn could see them. Officer Duyn testified that defendant began sweating profusely and his breathing had become more rapid. At this point, because Officer Duyn suspected that defendant may have a weapon and was concerned for his safety and that of Officer Seay, Officer Duyn asked defendant to step out of the car.

As defendant got out of the car, Officer Duyn saw something protruding from the center of defendant's waistband, in the front, and he was concerned that it might be a weapon. Officer Duyn said the object created a bulge in defendant's shirt that extended out approximately two inches. He asked defendant what he had under his shirt, and defendant began to reach for the object. Officer Duyn grabbed the object before defendant could reach it, and Officer Duyn said it felt hard and box-like. Officer Duyn pulled the object out of defendant's waistband and identified it as a cigar box. Officer Duyn said the box was large enough to contain a knife or a small caliber handgun.[2] Officer Duyn stated that the box was open on one side,[3] and one end of the box was partially open. He saw what he believed to be three hand-rolled marijuana cigarettes in the box through the cellophane window on the side. Officer Duyn told defendant that he was under arrest and to put his hands on the car. As Officer Duyn began to put one of defendant's hands behind his back, defendant tried to break free and run.

Officer Duyn took defendant to the ground within feet of the car, and he and Officer Seay attempted to handcuff him. Officer Duyn was on top of defendant's upper body, and Officer Seay tried to control defendant's legs. Officer Duyn stated that

---

[2]Officer Duyn testified that he knew a small caliber handgun could fit into the cigar box because approximately two months prior to this traffic stop, he arrested a subject with a .25 caliber Lorcin pistol in his pocket, and Officer Duyn failed to discover the weapon during his initial search of the subject. Officer Duyn stated that the .25 caliber Lorcin pistol that he later discovered was small enough to fit into the cigar box found in defendant's waistband.

[3]An examination of the cigar box by the court revealed that the cigar box is not open on one side, but it has a large, clear cellophane window on one side, making the contents of the box partially visible.

defendant kicked Officer Seay in head and shoulders. Defendant's father and others came

out of the residence at 20 Pratt Street, and according to Officer Duyn, defendant's father

told his son to put his hands behind his back. After the officers had defendant in custody,

Officer Duyn looked inside the cigar box and saw what he suspected to be three

marijuana cigarettes and several crack rocks. While Officer Duyn was placing the cigar

box containing the drugs into the trunk of the patrol car for safekeeping, Officer Seay

performed a search of defendant incident to arrest. Officer Seay pulled a clear plastic bag

containing crack and powder cocaine from defendant's front left pants pocket. Officer

Duyn stated that he saw Officer Seay begin to search of defendant; however, he did not

see Officer Seay pull the bag out of defendant's pocket because he was placing the other

drug evidence in the trunk of the patrol car at that time. Officer Duyn stated that Officer

Seay verbally alerted him to the discovery of the drugs. Officer Duyn also testified that

he did not see Officer Seay pull out defendant's pants pockets in front of defendant's

family members.[4] Officer Duyn identified the cigar box, marijuana cigarettes, crack, and

powder cocaine seized from defendant, and the government submitted these items as

Government Exhibit #1.

Officer Duyn stated that instead of arresting Varner for driving under suspension,

the officers issued him a ticket because he had been cooperative, and he was driving a

relative's car. Gov't Ex. #2. They also issued him a warning ticket for both a vehicle

license violation and making an improper turn. Officer Duyn stated that the seized off-

---

[4]Officer Duyn testified that he was not sure whether the entire search of defendant
incident to arrest occurred while defendant was standing next to Varner's car, in view of
defendant's family members.

white rock-like substance field-tested positive as crack. On cross-examination, he stated that the stop was not videotaped because the unmarked patrol car involved in the stop did not have a camera or recording equipment mounted inside.

In the incident report for the traffic stop, it states that "[o]n the above date and time, Officers Seay and Duyn initiated a traffic stop in reference to an improper turn, and a vehicle license violation (warning ticket #049536-F) on SC Tag:BRN376 in the area of Pratt St.[,] Charleston[,] SC 29407." Def. Ex. #7. At the suppression hearing, defendant argued that the warning ticket refers only to the vehicle license violation due to the placement of the parenthetical reference, and not the improper turn violation. Officer Duyn testified that a single warning ticket can refer to multiple violations and the incident report indicates that the warning ticket includes both the vehicle license and improper turn violations. The government and Officer Duyn attempted to get a copy of the warning ticket; however, copies of warning tickets are simply filed in a box, in no particular order, and the government was not able to find a copy of the ticket.

Varner presented an entirely different account of the traffic stop when he testified as the first defense witness at the suppression hearing. Varner stated that he has been close friends with defendant and his family since the mid-1980s. He stated that on the day of the traffic stop he was driving his mother's car, and he was giving defendant a ride to a barber shop. He said that he was traveling in the direction earlier described by Officer Duyn, that he made a right turn onto Pratt, and that officers eventually stopped his car in the driveway at 20 Pratt Street. Varner testified that contrary to Officer Duyn's testimony, he did use his turn signal when he made the right turn because it was his habit

to do so.  He also testified that the unmarked patrol car never activated blue lights or a siren at any point.  According to Varner, he did not realize that the individuals in the unmarked car were police officers until Officer Seay exited the car and approached his window.  At that point, Varner could see Officer Seay's police uniform.

Officer Seay asked Varner for his driver's license and registration, and Varner admitted that he had outstanding traffic tickets and he was sure that his license was suspended.  Varner said that Officer Seay never told him why the officers stopped the car; Officer Seay simply asked if he could search Varner's car after asking if Varner had drugs or weapons in the car.  Varner stated that he gave consent to search the car, and the officers found nothing inside.  Varner stated that there was no smell of marijuana in the car.

According to Varner, while he was standing behind his mother's car, he observed Officer Duyn ask defendant to step out of Varner's mother's car and then immediately throw him to the ground.  Varner testified that Officer Duyn choked defendant, using a night stick across his throat, while Officer Seay punched him.[5]  Varner heard defendant say that he could not breathe, and Varner said defendant's skin tone began to change color.

Varner stated that he never saw a cigar box, but he observed the officers handcuff defendant and pull out his pockets.  He said that the officers did not pull a clear plastic

---

[5]On cross-examination, Varner testfied that even though Officer Seay was punching defendant with his fists, defendant was not bloodied as a result.

bag out of his pants during the search, but they produced a bag much too large[6] to fit into someone's pants pocket after defendant was placed in the back seat of the patrol car, implying that the officers fabricated evidence against defendant. Varner claimed that Officer Seay accused him of having knowledge of the drugs, that he was a "crackhead," and that his mother's car would be towed because he had transported drugs. In response, Varner said he never knew defendant had any drugs, and Varner had no knowledge of any drugs. Varner testified that the officers celebrated the takedown of defendant, high-fiving each other and making unprofessional comments about throwing defendant to the ground. Varner said that he received a ticket for driving under suspension, first offense, but he never received a warning ticket. Varner reiterated that the officers never told him why they stopped him, but at some point during the stop, they said something about his license plate light. Varner said the comment did not make sense because the license plate light was functioning properly on his mother's car, and the stop occurred during daylight hours.

During cross-examination, Varner admitted that he was arrested in May 2009 for driving under suspension. He also admitted that his license remains suspended because he has failed to pay speeding tickets. In addition, Varner admitted that the officers treated him nicely by not towing his mother's car. When questioned about his observations regarding the officers' treatment of defendant, Varner admitted that he was not standing

---

[6]The court examined Government Exhibit #1, which includes the plastic bag containing crack and powder cocaine seized from defendant's front left pants pocket. The plastic bag is similar in size to a sandwich bag and could easily fit into a pants pocket.

at the back of his mother's car, where he could view defendant, for the entire period of time it took the officers to arrest and search defendant. Varner stated that at some point, he was handcuffed and sitting beside the patrol car.

Defendant's seventy-nine-year-old father, Fred Alston, testfied that he first became aware of the traffic stop when he heard defendant calling for him from the driveway of his house at 20 Pratt Street. He said that when he ran outside, he saw two officers beating up defendant. He said that he was approximately ten feet from defendant when defendant was on the ground. He testified that Officer Seay kicked defendant in the stomach and pulled him to the ground, as opposed to Varner, who said it was Officer Duyn who threw defendant to the ground. He stated that one officer was on top of defendant, and the other officer was holding a night stick across his throat to choke him. Mr. Alston described the night stick as a regular "beat cop" night stick, which looked like it was made of wood.[7] Mr. Alston testified that he did not see any blue lights on in the unmarked patrol car during his son's arrest, and he never heard a siren. He said his daughter and defendant's sister, Karen Alston, came out of the house within two or three seconds after he exited the house, and she was approximately ten to twelve feet from defendant. Mr. Alston stated that his daughter would have been able to see what he saw during defendant's arrest.

---

[7]Officer Duyn testified that he and Officer Seay carried collapsible batons made of metal. He said these batons are carried on the officers' duty belts and require a large swinging motion to extend the baton, which is roughly two and a half to three feet long. Officer Duyn testified that neither he nor Officer Seay used a baton during defendant's arrest.

Karen Alston testified that she saw two officers on top of defendant choking him; however, she did not see either of the officers use a night stick. She testified that when defendant screamed that he could not breathe, one of the officers was on top of him and the other one had control of his arm. After the officers handcuffed defendant and stood him up, she stated that she saw the officers pull out his pants pockets, which were empty. She stated that she never saw a cigar box, yet she admitted she did not look for a cigar box. Ms. Alston testified that she never saw a blue light on in the unmarked patrol car, and she never heard a siren. She stated that she heard an officer tell Varner to shut up and call him a "crackhead," but she never saw the officers high-five each other. She said she went back inside the house when her daughter arrived at the residence.

Rose Alston, another of defendant's sisters, also testified at the suppression hearing. She stated that she arrived at her father's residence after defendant's arrest. She saw Varner in between his mother's car and the unmarked patrol car, and other police cars were present. Varner attempted to say something to the police, and Ms. Alston stated that the officers told him to shut up and called him a "crackhead." Ms. Alston stated that she talked to the officers and explained that Varner's car belonged to his mother. She said that the officers were nice enough to let her drive Varner home and return his mother's car to her. She testified that she never smelled marijuana in the car, but the windows were down when she drove the car away. She said that no blue lights were on in any of the police vehicles present.

## II.  DISCUSSION

The Fourth Amendment to the United States Constitution guarantees "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  The Supreme Court has determined that a routine traffic stop constitutes a seizure within the meaning of the Fourth Amendment.  See Delaware v. Prouse, 440 U.S. 648, 653 (1979).   "An ordinary traffic stop is, however, a limited seizure more like an investigative detention than a custodial arrest."  United States v. Rusher, 966 F.2d 868, 875 (4th Cir. 1992) (citation omitted).

### A.  The Traffic Stop, Terry frisk, and the Seizure of Evidence

Courts use the analysis for investigative detention announced in Terry v. Ohio, 392 U.S. 1 (1968), to determine the scope of police authority in traffic stops.  Id. (citation omitted).  A court should consider the dual inquiry of "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  Id. (citations omitted).  "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred."  Whren v. United States, 517 U.S. 806, 810 (1996) (citations omitted).   "Observing a traffic violation provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop.  See, e.g., [Illinois v. Caballes, 543 U.S. 405, 407 (2005); Whren, 517 U.S. at 810; United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004)]."  United States v. Branch, 537 F.3d 328, 335 (4th Cir. 2008).

In United States v. Hassan El, 5 F.3d 726, 730 (4th Cir. 1993), the Fourth Circuit adopted the "objective test," which finds no "intrusion upon the Fourth Amendment" if "an officer has probable cause or a reasonable suspicion to stop a vehicle." The court quoted language from United States v. Cummins, 920 F.2d 498, 500-01 (8th Cir. 1990), in support of this holding:

> When an officer observes a traffic offense—however minor—he has probable cause to stop the driver of the vehicle . . . . [T]his otherwise valid stop does not become unreasonable merely because the officer has intuitive suspicions that the occupants of the car are engaged in some sort of criminal activity . . . . [T]hat stop remains valid even if the officer would have ignored the traffic violation but for his other suspicions.

Hassan El, 5 F.3d at 730.

Officer Duyn testified that he saw defendant make an improper turn, in violation of South Carolina law.[8] He stated that he and Officer Seay were approximately forty yards from the car driven by Varner, when they saw the car make a right turn onto Pratt Street without using a turn signal. Officer Duyn testified that nothing obstructed their view. The only evidence to the contrary is found in the testimony of Varner, whom the court finds to be less than credible.[9] Varner testified that when he drives, he uses turn

---

[8]Officer Duyn testified that the traffic stop occurred during his last day on the job as a CPD officer, a position he held for approximately two and a half years. He stated that he left the CPD on that date because his wife received a scholarship at the McLeod Regional Medical Center, in Florence, South Carolina, and they had to move to Florence. The court also notes that Officer Duyn did not provide any testimony that either Varner or defendant were known to be involved in drug-related activity. Consequently, the court finds little reason to believe that Officer Duyn had any incentive or ulterior motive to make up a reason to stop the car driven by Varner.

[9]As a general observation, Varner testified that the police officers involved in the traffic stop violated the law at every opportunity by stopping him for no reason, not using blue lights and a siren to initiate the stop, not informing Varner of the reason for the stop,

signals as a matter of habit. He said he used his right turn signal on the date of the traffic stop. Varner's alleged strict adherence to the traffic laws of South Carolina is undermined by the fact that he admitted to being arrested for driving under suspension in May 2009, and he knew that his driver's license was suspended on the date of the instant offense because he had failed to pay an unknown number of speeding tickets. The officers certainly could have arrested defendant for driving under suspension on the date of the traffic stop; however, Varner proved to be cooperative and had the good fortune of driving his mother's car on that date. As a result, the officers decided to issue Varner a citation instead of placing him under arrest and taking him to jail and towing his mother's car. Accordingly, the court finds that the officers had probable cause to stop the car driven by Varner.

The court is also not swayed by Varner's testimony that the officers never informed him why they stopped him. He claimed that the officers made a comment about his license plate light. Neither Officer Duyn nor the incident report (Def. Ex. #7) mentioned a license plate light violation, and the fact that the traffic stop occurred during daylight hours provides no basis for such an infraction.

As a final point regarding the initial traffic stop, the court heard extensive testimony from defense witnesses regarding whether they observed blue lights or heard a

---

calling him a "crackhead," beating and choking defendant, and falsifying drug evidence against defendant. The only saving grace for the officers in Varner's testimony is the fact that they issued him a warning ticket instead of arresting him and allowed his mother's car to be returned to her. It is hard to believe that the same officers who were so mendacious and aggressive in stopping Varner suddenly became gracious and forgiving, issuing him a warning ticket and allowing him to be driven home.

police siren during or immediately after the traffic stop. Varner testified that Officers Duyn and Seay failed to use blue lights or a siren when they initiated the traffic stop. Officer Duyn testified that the officers activated their blue lights and siren to initiate the traffic stop. He further testified that the blue lights remained on for an undetermined period during the stop. Once again, the court is not compelled by Varner's testimony to find that Officers Duyn and Seay, who regularly conducted traffic stops in high crime areas, failed to use blue lights and a siren to appropriately effect this traffic stop. Varner's version of the stop makes no sense.

The Fourth Circuit has held that "[i]f the initial stop was illegal or the officers exceeded the stop's proper scope, the seized contraband is excluded under the 'fruit of the poisonous tree doctrine.'" Rusher, 966 F.2d at 875 (citations omitted). Following Terry, the law has become well established that during a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation. Id. at 876-77. According to the Fourth Circuit,

> When a driver has produced a valid license and proof that he is entitled to operate the car, he must be allowed to proceed on his way, without being subject to further delay by police for additional questioning. Any further detention for questioning is beyond the scope of the Terry stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime.

Id. (quoting United States v. Guzman, 864 F.2d 1512, 1519 (10th Cir. 1988) (citing Florida v. Royer, 460 U.S. 491, 498-99 (1983); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)).

The Supreme Court has held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Pennsylvania v. Mimms, 434 U.S. 106, 111 n.6 (1977). The Court has also determined that police officers are exposed to even greater danger during a traffic stop when an automobile is occupied by passengers in addition to the driver. Maryland v. Wilson, 519 U.S. 408, 414 (1997). "While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal. We therefore hold that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." Id. at 414-15.

> In United States v. Sakyi, the Fourth Circuit held,
>
> [W]e conclude that we may not rely on a generalized risk to officer safety to justify a routine "pat-down" of all passengers as a matter of course. Because a frisk or "pat[-]down" is substantially more intrusive than an order to exit a vehicle or to open its doors, we conclude that an officer must have justification for a frisk or a "pat-down" beyond the mere justification for the traffic stop.
>
> The holdings in Terry and [Michigan v. Long, 463 U.S. 1032 (1983)] permitted frisks only when the officer perceived an appropriate level of suspicion of criminal activity and apprehension of danger, and we conclude that such a showing is necessary here.

160 F.3d 164, 168-69 (4th Cir. 1998). "Police may conduct a patdown search without a warrant if, under the totality of the circumstances, the officer has an articulable, reasonable suspicion that a person is involved in criminal activity and that he is armed." United States v. Raymond, 152 F.3d 309, 312 (4th Cir. 1998) (citing Terry,

392 U.S. 1 (1968)). "The reasonableness of the search is measured objectively. If a reasonably prudent person would believe that his safety, or the safety of others, is endangered, he may conduct a limited search of outer clothing to discover any weapons." Id. (citing Terry, 392 U.S. at 27). "The concept of reasonable suspicion, like probable cause, is not 'readily, or even usefully, reduced to a neat set of legal rules.'" United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). The court must consider "'the totality of the circumstances—the whole picture'" surrounding the stop. Sokolow, 490 U.S. at 8 (quoting United States v. Cortez, 449 U.S. 411, 417 (1981)).

In Sakyi, the Fourth Circuit also held that,

in connection with a lawful traffic stop of an automobile, when the officer has a reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others.

160 F.3d at 169.

The holding in Maryland v. Wilson, quoted above, clearly grants Officer Duyn the legal right to order defendant, as a passenger, out of the vehicle driven by Varner. Officer Duyn's decision to remove defendant from the car is further supported by the following observations during his interview with defendant: defendant appeared extremely nervous and was sweating profusely and breathing rapidly, he repeatedly reached for his left front pants pocket and the center console, and he failed to obey the officer's commands to stop reaching for those areas. The court finds that these same facts and circumstances, viewed as a whole, would also lead a reasonable police

officer to believe that defendant may have a weapon, providing the reasonable suspicion necessary for a <u>Terry</u> frisk.  Moreover, pursuant to <u>Sakyi</u>, Officer Duyn's testimony that he smelled the odor of marijuana coming from the car justified removing defendant from the car and conducting a <u>Terry</u> frisk.

The case of <u>Minnesota v. Dickerson</u> "set forth the 'plain feel' doctrine, which holds that contraband discovered during a lawful <u>Terry</u> stop is admissible so long as the search does not exceed the bounds permitted by <u>Terry</u>."  <u>Raymond</u>, 152 F.3d at 312 (quoting <u>Dickerson</u>, 508 U.S. 366, 373 (1993)).  "Thus, if the contour or mass of the object makes its identity immediately apparent, the officer may lawfully seize it."  <u>Id.</u>  (citing <u>Dickerson</u>, 508 U.S. at 375).  "Once an officer has determined that the object is not a weapon, however, and if its shape or seize does not indicate its contraband nature, the search must stop."  <u>Id.</u>  (citing <u>Dickerson</u>, 508 U.S. at 378).

"The purpose of a frisk is to allow an officer 'to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.'"  <u>United States v. Swann</u>, 149 F.3d 271, 275 (4th Cir. 1998) (quoting <u>Terry</u>, 392 U.S. at 23)).  In <u>Swann</u>, the Fourth Circuit held that "<u>Dickerson</u>'s rule, that a frisk violates the Fourth Amendment if it continues after the officer has determined that the suspect is unarmed," is not implicated when the officer is not assured that the unidentified object detected is not a weapon.  149 F.3d at 275.  "[T]he test for whether an officer may search farther and seize the item is an objective one . . . [W]ould a reasonable officer in those circumstances have believed that the item could likely be a weapon?"  <u>Id.</u>

The standard of "reasonableness" under the [F]ourth [A]mendment is wholly objective; the question is whether the officer's actions are "objectively reasonable" in light of the facts and circumstances confronting him, without regard to his own subjective intent or motivation. Subjectively bad intentions on the part of the individual officer will not make a constitutional violation out of an otherwise reasonable seizure; nor will subjectively good intentions render an objectively unreasonable seizure constitutional.

Id. at 276 (quoting Martin v. Gentile, 849 F.2d 863, 869 (4th Cir. 1988)).

"Searches and seizures of property in plain view are presumptively reasonable." Kyllo v. United States, 533 U.S. 27, 42 (2001). "'The plain-view doctrine authorizes warrantless seizures of incriminating evidence when (1) the officer is lawfully in a place from which the object may be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the object's incriminating character is immediately apparent.'" United States v. Green, 599 F.3d 360, 376 (4th Cir. 2010) (quoting United States v. Jackson, 131 F.3d 1105, 1109 (4th Cir. 1997) (citing Horton v. California, 496 U.S. 128, 136-37 (1990)).

Officer Duyn testified that he believed that the bulge in defendant's waistband might be a weapon. When asked about the bulge, instead of answering Officer Duyn's question, defendant reached for it. Under those circumstances, the court concludes that a trained police officer could have reasonably believed that defendant possessed a concealed weapon and may have been preparing to use it, and Officer Duyn was justified in removing the cigar box from defendant's waistband. Upon removing the cigar box and without opening it, the officer saw what he believed to be several hand-rolled marijuana cigarettes inside the box. He could see the suspected

marijuana cigarettes through a clear cellophane window on one side of the box. Once Officer Duyn saw the suspected marijuana, he could lawfully seize the box pursuant to the "plain view" doctrine and effect defendant's arrest. The seizure of the cigar box and its contents complied with all three of the plain view seizure requirements.

Pursuant to Chimel v. California, the officers had the right to search defendant and areas within his immediate control without a warrant after he was placed under arrest. 395 U.S. 752, 762-63 (1969). Despite Varner's testimony that the officers somehow later produced a bag of drugs that was not seized from defendant's person, he admitted that he was not in a position to observe the entire course of defendant's arrest and the subsequent search incident to arrest. At some point, he was handcuffed and sitting beside his mother's car. Defendant's father and sister, Karen, testified that they watched as Officer Seay pulled out defendant's pockets, which were empty; however, it is unclear from their testimony whether the entire search incident to arrest occurred as the defendant stood in view of these individuals, or whether it began immediately after defendant was handcuffed and while he was on the ground. Officer Duyn testified that he did not see the entire search. He also testified that Officer Seay called to him when he discovered the drugs in defendant's front left pants pocket, and at the time, Officer Duyn was in the process of securing the cigar box and related drug evidence in the trunk of the patrol car. This testimony, coupled with Officer Duyn's observations of defendant repeatedly reaching for his front left pants pocket while in the car and the court's examination of Government Exhibit #1, leads the court to find that defendant possessed the crack and powder cocaine, and Officer Seay lawfully

seized these drugs in a valid search incident to arrest.

### B. Defendant's Allegations that the Police Officers Used Excessive Force

As a final matter, the court acknowledges that all of the defense witnesses provided lengthy testimony alleging that the arresting officers used excessive force by choking and beating defendant while effecting his arrest. The witnesses' testimony appears to have a common theme; however, each witness gave a significantly different account of the alleged assault.

Mr. Alston, defendant's father, and Karen Alston, defendant's sister, were standing very close to each other and defendant at the time of his arrest. Mr. Alston claimed that the officers used a wooden night stick to choke defendant, yet Karen Alston testified that she did not see a night stick. Officer Duyn testified that neither he nor Officer Seay used a night stick or baton during the arrest, and the two officer do not carry wooden night sticks; they carry collapsible metal batons. Varner testified that Officer Seay punched defendant with his fists, but defendant was not bloodied and neither Mr. Alston nor Karen testified that they observed such behavior.

The court does not casually dismiss such allegations. They may be for another court and another case and another day. Regardless, consideration of these allegations is unnecessary to determine whether the officers had the probable cause and reasonable suspicion necessary to make the traffic stop, frisk defendant for weapons, and seize the drug evidence found on his person.

### III.  CONCLUSION

For the reasons set forth above, the court **DENIES** defendant's motion to

suppress and dismiss.

**AND IT IS SO ORDERED**.

_____
**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**October 25, 2010**
**Charleston, South Carolina**